**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LEAH A. SEALS | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| THE HARTFORD FINANCIAL | ) | |
| SERVICES GROUP, INC.; HARTFORD | ) | |
| LIFE AND ACCIDENT INSURANCE | ) | |
| COMPANY; EPLUS, INC.; and THE | ) | |
| EPLUS INC. WELFARE BENEFIT PLAN | ) | |

## COMPLAINT

Plaintiff Leah Seals brings this action for violations of the Employee Retirement Income Security Act of 1974 ("ERISA") committed by the defendants named herein.

1.      This suit is brought pursuant to 29 U.S.C. §1132 in order to secure benefits due to Plaintiff through the ePlus, Inc. Welfare Benefit Plan, (the "Plan").

2.      Plaintiff seeks past due and future long term disability benefits; continuation of coverage for her disability insurance, life insurance, and accidental death and dismemberment (AD&D); and waiver of premium and payment of premium benefits under the (basic and supplemental) disability, life, and AD&D policies issued by or administered by Defendants, as well as any other direct or ancillary benefits available through the Plan that are related to a finding of disability.

3.      Plaintiff also seeks payment of unpaid interest from the lengthy delay in making LTD benefit payments under the Plan.

4.      Plaintiff also seeks prejudgment interest.

5.      Plaintiff seeks benefits based on the several conditions documented in her medical records and claims documents, including among other things:

Seizure disorder, cognitive deficits, rheumatoid arthritis, degenerative disc disease, disc herniation, multiple types of radiculopathy, hip pain, lumbago, cervicalgia, Hashimoto's thyroiditis, hyperlipidemia, obesity, chronic anemia, chronic headaches extreme fatigue, anxiety, major depression, asthma, sleep apnea, restless leg syndrome, angina, osteoporosis, osteopenia, Barrett's esophagus, GERD, gastroparesis, chronic dry eyes, sciatica, and multiple environmental and food allergies.

6.      These conditions and the large amount of medications they require result in chronic restrictions and limitations which Plaintiff's physicians have assessed as being permanent and total in nature.

7.      Suit is also brought to enforce the statutory obligation of the above-named defendants to produce all instruments and documents pertaining to administration of her ERISA employee welfare benefits required under 29 C.F.R. §2560.503-1.

## JURISDICTION

8.      Jurisdiction is appropriate under 28 U.S.C. §1331 in that 29 U.S.C. §1132 confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or "employee pension plan" as those terms are defined within 29 U.S.C. §1001, et. seq.

## VENUE

9.      Venue is appropriate in that a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred within this district. Venue is also proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391 because Defendants maintain business activity in and are in this district.

## PARTIES

10.     Plaintiff Leah Seals is a resident of Tomball, Texas.

11.     Defendant The Hartford Financial Services Group, Inc. ("The Hartford") is a

foreign corporation incorporated in the State of Connecticut. It maintains its principal place of business in Hartford, Connecticut.

12.     The Hartford is a "fiduciary" of the Plan as that term is defined by 29 U.S.C. §1002(21).

13.     The Hartford exercised authority or control respecting the management or disposition of the Plan assets, and is, therefore, a "fiduciary" as that term is defined by 29 U.S.C. §1002(21).

14.     The Hartford provides services to the Plan at issue, and as such is a "party in interest" as that term is defined by 29 U.S.C. §1002(14).

15.     The Hartford is the insurer and/or claims administrator for the Plan.

16.     The Hartford's designated agent for service of process is:   CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201, or wherever it may be found.

17.     Defendant Hartford Life and Accident Insurance Company ("Hartford Life") is a foreign corporation incorporated in the State of Connecticut. It maintains its principal place of business in Hartford, Connecticut.

18.     Hartford Life is a "fiduciary" of the Plan as that term is defined by 29 U.S.C. §1002(21).

19.     Hartford Life exercised authority or control respecting the management or disposition of the Plan assets, and is, therefore, a "fiduciary" as that term is defined by 29 U.S.C. §1002(21).

20.     Hartford Life provides services to the Plan at issue, and as such is a "party in interest" as that term is defined by 29 U.S.C. §1002(14).

21.     Hartford Life is the insurer and/or claims administrator for the Plan.

22.     Hartford Life's designated agent for service of process is:   CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201, or wherever it may be found.

23.     Defendant ePlus, Inc. is the employer that maintained the benefit plan at issue and may be served with process by serving: United Agent Group, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

24.     The ePlus Inc. Welfare Benefit Plan, (the "Plan") is an "employee welfare benefit plan" as defined within 29 U.S.C. §1001, et. seq., and may be served with process by serving either: 1) United Agent Group, Inc., 5444 Westheimer #1000, Houston, Texas 77056 or 2) Director, Human Resources, c/o ePlus Inc., 13595 Dulles Technology Drive, Mailbox 157-Human Resources, Herndon, Virginia 20171, or wherever it may be found.

## THE PLAN

25.     The Plan was funded by insurance policies sold by The Hartford and Hartford Life ("Hartford," collectively), the companies which also underwrote the policies. As such, the Plan is insured by Hartford.

26.     The policies, also sometimes referred to as the "Plan," were provided for the purpose of conferring a benefit upon Plaintiff and other employees. They qualify as an employee welfare benefit plan as defined in 29 U.S.C. §1002(1).

27.     Plaintiff is a participant and a beneficiary under the Plan as defined in 29 U.S.C. §1132. Plaintiff is "disabled" under the terms of the Plan.

## CLAIM HISTORY

28.     Until her October 2011 disability, Plaintiff was employed by ePlus, Inc. as a Project Manager. Her job required managing implementation of software and testing for clients as well as a large amount of customer interaction and support.

29.     She had worked in this field for decades before her disability.

30.     Plaintiff had a heart attack in October 2010, but she returned to work as soon as possible.

31.     Beginning in August 2011, Plaintiff began experiencing severe headaches, but she again continued to work despite her difficulties.

32.     Both her treating cardiologist and rheumatologist unsuccessfully attempted to order MRIs in October 2011, but her insurer refused to pay for it.

33.     Her physicians advised her to cease working, but she failed to heed this advice because she did not want to lose her job.

34.     Ms. Seals then saw a neurologist on November 1, 2011 who again unsuccessfully attempted to obtain an MRI.

35.     An MRI was finally obtained on November 18, 2011, but the radiologist stopped the procedure and she was emergently transferred to the hospital for an immediate craniotomy because she had two very large subdural hematomas, one of which was three (3) months old and another that was about a month and a half old.

36.     She was extremely lucky to be alive. Hartford tried to deny her claim for disability benefits anyway.

37.     Eventually, The Hartford acknowledged upon appeal it was clear Ms. Seals was disabled and it paid benefits on that basis for the next nine (9) years.

38.     Ms. Seals's treating physicians and the Social Security Administration have also repeatedly concluded Ms. Seals is permanently disabled from performing any occupation.

39.     In May 2019, Hartford suddenly concluded Seals had made a remarkable recovery and flagged her claim for denial *solely* because Seals indicated she sometimes assisted her elderly parents, who lived next door to her.

40.     The Hartford referred Plaintiff's claim to its Special Investigations Unit (SIU). Hartford involves its SIU when it suspects that an insured is, or might be, committing insurance fraud.

41.     Hartford's SIU retained Hub Enterprises to assist in its administration of Seals's claim by surveilling her.

42.     Despite only being paid for 16 hours of surveillance, Hub surveilled Seals for over 22.5 hours in June 2019.

43.     That 22.5 hours of surveillance revealed Seals was involved in a total of **24 seconds** of activity. That activity consisted of Seals sitting on a bench on her porch and talking to the man who was painting her mother's house next door.

44.     In an attempt to gin up a basis for denying her claim, Hub and Hartford misrepresented the contents of the video, claiming it showed Seals "standing and conversing" and "ambulat[ing] in an unrestricted manner."

45.     Hartford then paid Hub to surveil Seals for another 16 hours in July 2019.

46.     For no additional charge, Hub surveilled Seals for roughly 20 hours.[1]

47.     That 20 hours of surveillance resulted in Hub recording roughly 21 minutes of activity on July 12, 2019, from 11:13 a.m. to 11:34 a.m.

---

[1] In both instances, Hub's videos came entirely from the extra, unpaid time. Having nothing to show for all the time it surveilled Seals, Hub decided to go back at no extra charge, presumably because Hartford expected something it could use to deny benefits.

48.     The resulting video was edited in at least a dozen places, which resulted in roughly half of those 21 minutes being removed/deleted.

49.     Many of those removed portions come at very conspicuous times, such as when Seals was about to walk down the steps of her porch.

50.     At best, the video indicates roughly 10 minutes of activity where Seals assisted her elderly mother by moving one bag of mulch with a dolly. Just before another suspicious edit/removal, it appears Seals required her mother's assistance to load that bag onto the dolly, and Seals clearly struggles to push the dolly the perhaps 20 feet to her garage. Most of the 10 minutes of activity is Seals standing and puttering around.

51.     The video also showed her and her mother moving several primarily empty white kitchen-size garbage bags with unknown contents. Despite Seals's elderly mother lifting some of those bags with ***one hand***, Hub and the Hartford described the video as showing Seals lifting "heavy" bags. Hartford also later claimed, without evidence, that Seals suffered no pain or adverse consequences from this very brief activity.

52.     On August 15, 2020, Hartford then sent Rick Luna from its Claims Solutions and Analytics Department to interview Ms. Seals. Luna interviewed Seals at her home, and the interview was recorded.

53.     Luna made no attempt to ask her about (or inform her of) the two surveillance videos, what items were being moved in the video, or if any pain was involved.

54.     Hartford's main take-away from that interview was Luna's observation that she did not "spontaneously complain of pain" during their ~40-minute interview.

55.     Hartford repeatedly refused to provide Seals with an unedited version of the surveillance video or a copy of Luna's recording. To this day, it has still failed to do so.

56.     Hartford made no attempt to retrieve any ERISA claim file materials in Hub's possession, even after Seals issued a potential litigation hold request.

57.     In October 2019, Hartford began circulating the heavily edited surveillance videos along with a brief written misrepresentation of the video's contents. It is unclear if the video was even sent to the physicians given Hartford sent Seals a video of a different insured.[2]

58.     Under the circumstances, this was clearly an unsuccessful attempt to damage Ms. Seals's relationships with her treating physicians, or at least disincentive them from continuing to assist her with her disability claim. If it were not preempted by ERISA, it would be a classic case of tortious interference with contract.

59.     Hartford then scheduled an in-person medical examination with Dr. Bakht for February 28, 2020.

60.      In order to ensure that Dr. Bakht had all of Seals's medical records, the undersigned sent a complete package of medical records to Dr. Bakht.

61.     Hartford responded by cancelling Dr. Bakht's medical examination at the last minute.

62.     During Hartford's cancellation call with counsel, Hartford explained it would then either submit the remaining documents before the IME or as a supplement soon after.

63.     To ensure transparency and the non-adversarial review guaranteed by ERISA, Hartford agreed to provide a detailed list of what was removed from the packet sent to Dr. Bakht, identifying those documents by their Bates numbers.

---

[2] Given the busy schedules of these physicians, Hartford knew most physicians would typically only review the written summary of these videos, if the physician reviewed the correspondence at all. As a matter of policy, many physicians simply refuse to get involved in these matters at all because of the significant and uncompensated burden involved. They are already weary from dealing with health insurance companies, so few are willing to add disability insurers into the mix as well.

64.     This agreement was memorialized in a February 27, 2020 letter, but Hartford's claim file production indicates Hartford ignored the agreement.

65.     Hartford ignored nearly all of Seals's communications after that point.

66.     The IME was rescheduled for March 20, 2020. In advance of that examination, counsel wrote a letter on March 10, 2020, expressing dismay that Dr. Bakht's office had called asking for $6,500 for the IME. This was a clear violation of ERISA's prohibition of requiring insureds to pay administration-related costs.

67.     The March 20, 2020 exam was cancelled because Houston had implemented a lockdown due to the COVID-19 pandemic. Further, Dr. Johnson, Ms. Seals's rheumatologist, had placed her under stay-at-home instructions because she is immunosuppressed due to her conditions and medications. Dr. Bakht's office understood the wisdom of this choice.

68.     After the exam's cancellation, Hartford retained Dr. Polanco to provide an opinion to justify denying Seals's benefits. This purpose was clear given Polanco's history, and Hartford explicitly stated so when it told Dr. Polanco that "we will conclude there are no restrictions on the activity *unless specified in your report*." In other words, Hartford intended to ignore any medical evidence beyond Dr. Polanco's report (e.g. Seals's treating physicians).

69.     Given Dr. Polanco's extensive work with Aetna,[3] Hartford was well-aware Dr. Polanco's opinions had been repeatedly found to be unreliable by federal courts due to his apparent tendency to tell insurers what they wanted to hear. *See e.g.* Ex. 1, October 14, 2020 appeal letter p. 7-9 (listing cases). On information and belief, this was the precise reason Hartford chose Dr. Polanco.

---

[3] Hartford acquired Aetna several years ago and appears to have subsumed it entirely.

70.     Dr. Polanco drafted an April 8, 2020 opinion, which made a significant number of misrepresentations. The worst of these was his statement that he had been unable to reach any of Seals's treating physicians.[4] Hartford faxed Dr. Polanco's opinion to Seals's treating physicians.

71.     Dr. Johnson, Seals's rheumatologist, contacted Hartford to tell it that he had in fact spoken with Dr. Polanco, who was very abrupt, and that he was either "ignoring their conversation or lying about it."[5]

72.     Counsel also sent a letter expressing concern about this behavior and revoking all HIPAA authorizations until this misconduct would not be repeated. Exhibit 2, April 9, 2020 letter.

73.     Hartford again ignored counsel, and its *only response* was to instruct Dr. Polanco to talk with Dr. Johnson again (violating the HIPAA revocation).

74.     Unsurprisingly, Dr. Polanco issued a conclusory opinion based purely upon his paper review of records that found no disability, overruling the specialist[6] opinions of the numerous physicians who had actually treated Ms. Seals for at least a decade at that point.

75.     Also unsurprisingly, Hartford adopted Dr. Polanco's opinion in whole and terminated Seals' benefits, inexplicably concluding she made a full recovery and suffered no limitations or restriction whatsoever as of May 1, 2020.

---

[4] It is a routine requirement that an insurer's pure-paper medical reviewers (i.e., they examine or have any contact with the insured) try to have a discussion with the treating physician before writing an opinion that rejects the treating physician's opinion.

[5] It is extremely unusual for busy physicians to take the time to respond to disability insurer's communications, let alone do what Dr. Johnson has done here.

[6] Dr. Polanco was not certified in any of the pertinent specialties involved, and Hartford explicitly chose not to conduct a co-morbid review that factored in all of Seals's conditions.

76.     Ms. Seals requested a copy of her ERISA claim file repeatedly over the course of several months.

77.     In violation of ERISA, Hartford ignored those requests until Seals went to the expense of serving its registered agent. Despite its lengthy delay, Hartford refused to expedite production of the claim file.

78.     The required contents of an ERISA claim file are set out in 29 C.F.R. §2560.503-1(m)(8). Hartford ignored those requirements and removed or failed to obtain large swaths of the claim file when it belatedly provided these materials to Seals.

79.     For instance, Hartford refused to provide an unedited copy of the surveillance videos; a copy of the audio recording of Luna's interview; a copy of all claims analytics and modeling materials generated for Seals's claim; the claim file materials in the possession of Hub, MLS, and Polanco; all communications regarding her claim; or anything describing what had been withheld as privileged.[7]

80.     Hartford's production also included surveillance videos taken of an entirely different woman from Arizona who was involved in a far larger amount of physical activity. This Arizona woman was presumably another Hartford insured. It is unclear if Hartford advised the Arizona woman that it had violated her privacy by publishing this video to third parties.

81.     Hartford refused to provide an unedited copy of the surveillance videos or a copy of the audio recording, claiming that an ERISA fiduciary is permitted to alter and withhold basic claim file materials.

---

[7] Privilege could not possibly apply to anything relating to the administration of Seals's benefits due to the fiduciary duty exception to privilege. This exception is universally held to apply to ERISA fiduciaries, and there is no dispute as to Hartford's status as an ERISA fiduciary charged with acting solely in Seals's best interests.

82. Failure to comply with ERISA's claims regulations is a *per se* a denial of a "full and fair review." This is essentially ERISA's version of a due process violation, which typically results in dispositive relief for the insured.

83. Seals appealed her denial on October 14, 2020. ERISA's regulations provided Hartford with 45 days to issue its decision, with an additional 45 days available if there are "special circumstances." Thus, even if special circumstances are assumed, its decision was due no later than January 12, 2021.

84. Hartford did not provide its denial until January 27, 2021.

85. The post-appeal denial ERISA claim file provided to Seals documents little-to-nothing about Hartford's activity after its initial May 1, 2020 denial. Thus, Hartford failed to fix its previous deficiencies and appears to have made this problem far worse by omitting most of the new claims materials generated during Seals's appeal (e.g., communications post-appeal, payments made to the new reviewers, etc.).

86. Hartford's appeal decision essentially pretended Dr. Polanco did not exist and was based upon the opinions of three new paper reviewers. Ignoring all the other problems, Seals pointed out that this meant she was now forced to appeal from a decision without any medical basis whatsoever. Indeed, Hartford ignored Seals's repeated queries as to why it decided that she had magically fully recovered on May 1, 2020.

87. Ignoring industry, ERISA's, and its own standards, Hartford specifically chose to prevent its new paper reviewers from having any contact with Seals's treating physicians.

12

88.     Unlike with Dr. Polanco's opinion, Hartford provided Seals with a very brief window to respond to the opinions of these new reviewers.[8]

89.     In responding within that narrow timeframe, Seals pointed out that these reviewers had not been provided all of the evidence and that they misstated a number of facts, and that they expressly relied upon those misstatements when concluding Seals had made a miraculous recovery on May 1, 2020. Seals was very specific in her observations and explanations, but, like Seals's treating physicians' opinions, Seals's concerns were summarily dismissed or ignored by Hartford and its new paper reviewers.

90.     Hartford uses claims analytics and predictive modeling to drive the way in which claims are handled, which employees are chosen to handle a claim, what resources are allocated to investigating a claim, and the claim's ultimate result. These tools based decisions primarily on factors such as the amount of benefits an insurer will have to pay and the statistical likelihood an insurer can save money by denying a claim. These things have nothing to do with whether a particular claimant is disabled or the promises made in the relevant policy, and this is completely irreconcilable with Hartford's fiduciary status.

91.     The manner in which Ms. Seals's claim was handled makes it clear it was driven by financial factors. It was not the non-adversarial review conducted by a disinterested fiduciary acting solely in Ms. Seals's best interests required by ERISA. Hartford chose to put profits before people like Ms. Seals.

92.     To date, Ms. Seals still has not been provided a complete claim file, and Hartford has ignored the fiduciary duty exception to privilege. Hartford has also refused to produce the materials generated by its agents on Hartford's behalf, and there is significant concern that

---

[8] ERISA fiduciaries are ***required*** to allow insureds the opportunity to respond to new evidence before issuing an adverse decision.

Hartford's actions and inactions have led to spoliation. The disability claim file produced omits numerous records, particularly those involving correspondence exchanged with outside parties and notes generated during the course of its claim administration.

93.     Hartford violated several of its internal claims handling procedures and standards.

94.     It also appears Hartford has no procedures in place regarding preservation and production of ERISA claim file materials generated by the agents it retains to assist in administrations (e.g., Hub or its medical reviewers), nor does Hartford make any attempt to inform these agents of ERISA's claim file requirements and their obligations to preserve and produce all such materials.

95.     Thus, Hartford routinely violates ERISA's basic claim file requirements and ERISA's foundational "full and fair review" obligations.

96.     In administering the disability claim, Hartford has committed numerous breaches and errors including the following:

> (a)     Targeting Plaintiff's claim for denial when it was learned her claim was governed by ERISA;
>
> (b)     Failing to take any meaningful measures to insulate the claims personnel who handled Plaintiff's claim from Defendants' inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence these persons to engineer the termination and closure of Plaintiff's claim;
>
> (c)     Withholding numerous relevant documents and information from Plaintiff during the claims process;
>
> (d)     Depriving Plaintiff of the ability to obtain a full and fair review of her

claim;

(e)     Taking an adversarial posture against Plaintiff instead of a fiduciary posture by openly searching for ways to avoid paying part or all of her claim;

(f)     Failing to accord any weight at all to Plaintiff's medical providers and instead relying on error-prone and inattentive "paper reviewers" to determine the effects Plaintiff's numerous disabilities;

(g)     Purposefully limiting and curtailing the review of medical consultants and otherwise improperly exerting influence on them to opine against payment of benefits;

(h)     Purposefully and persistently misleading Plaintiff into believing that she did not need to submit any additional medical documentation in support of the claim and otherwise refusing to tell Plaintiff what she needed to provide before her claim could be perfected and paid;

(i)     Unreasonably and arbitrarily overruling all of the professionals who personally examined Plaintiff or allowing any of them the opportunity to "peer review" Defendants' reviewers after Plaintiff completed her appeal (essentially conducting a one-way medical review process);

(j)     Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how her conditions and medications impacted one another; and

(k)     Failing to make any meaningful attempt at examining Plaintiff or attempting to converse with her treating physicians.

97.     Despite Plaintiff's established disability under the terms of her Plan, taking into account her condition as a whole, and her physicians' submission of medical records supporting those restrictions, Hartford claims team determined that Plaintiff was capable of working.

98.     Hartford failed to provide Plaintiff with a meaningful opportunity for a full and fair review of her claims for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1.

99.     Hartford refused to provide Plaintiff with relevant documentation concerning her Plan and her claim generally which controlled how her claim was administered.

100.     Hartford's decision process in this matter did not comport with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor Regulations.

101.     Plaintiff has exhausted all Plan remedies. This case is ripe for determination.

## COUNT I

### RELIEF UNDER 29 U.S.C. § 1132(a)

102.     Plaintiff adopts and incorporates all of the paragraphs above as though fully set forth herein.

103.     The Plan is deemed "employee welfare benefit plan" and/or "employee pension plan" as those terms are defined in 29 U.S.C. §1001, et. seq.

104.     Plaintiff is a "participant" and a "beneficiary" in the employee welfare benefit and/or pension plan as those terms are defined under 29 U.S.C. §1001, et. seq.

105.     Plaintiff is disabled under the terms of the employee welfare benefit plan. Accordingly, she is entitled to long term disability benefits and waiver of premium benefits for her disability, life, and AD&D coverages.

106.    Defendants' termination of the Plaintiff's benefits was not, and is not, supported by substantial evidence.

107.    Defendants denied Plaintiff's benefits to which she was entitled under the terms of the employee welfare benefit plan/insurance policy or policies by refusing to provide or discontinuing payment of benefits.

108.    Hartford's wrongful denial of disability benefits directly resulted in the termination of Plaintiff's life insurance and AD&D insurance coverage under the Plan.

109.    The decision-making process did not comport with 29 U.S.C. §1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with the Department of Labor Regulations.

110.    The decision-making process did not provide a reasonable opportunity to Plaintiff for a full and fair review of the decision denying the claim, as is required by 29 U.S.C. §1133 and 29 C.F.R. 2560.503-1.

111.    The appellate procedures did not provide Plaintiff with a full and fair review.

112.    Defendants' actions were wrong, unreasonable, and arbitrary and capricious and in violation of the terms of the employee welfare benefit plan/insurance policy.

113.    Hartford's claims process and claims decisions were tainted by conflict of interest which motivated claims personnel to deny Plaintiff's claim.

114.    As a direct and proximate result of the conduct of Defendants in failing to provide benefits for Plaintiff's disability and/or terminating benefits, and in failing to provide a full and fair review of the decision to deny benefits and/or terminate benefits, Plaintiff has been damaged in the amount equal to an amount of benefits to which Plaintiff would have been

entitled under the Plan, in an amount equal to future benefits payable while Plaintiff remains disabled under the terms of the Plan, and the cost of coverage and amount of any additional coverages (such as Life and AD&D coverage) afforded under the plan with a disability finding.

## STANDARD OF REVIEW

115.    The default standard of review for denial of a benefit claim is *de novo*. Where the Plan or Policy confers discretion on the Claims Administrator, an abuse of discretion (i.e., arbitrary and capricious) standard of review may apply.

116.    *De novo* review applies to this claim under Texas law.

117.    The Plan or Policy may contain a discretionary clause or language Hartford may contend affords it discretion to determine eligibility for benefits, to interpret the Policy, and determine the facts. Hartford's denial under this standard of review, if any, was an abuse of discretion. It was arbitrary and capricious.

118.    If discretion applies, the Court should afford Hartford less deference in light of its financial conflict of interest. Hartford's conflict of interest is both structural and actual. Its structural conflict results from its dual role as the adjudicator of Seals's claim and as the potential payor of that claim.

119.    Hartford's actual financial conflict is revealed in the policies, practices, and procedures influencing and motivating claim delays and denials for financial gain. Hartford's financial conflict is also revealed in the high return gained from the delay in payment or denial of claims.

120.Each of these grounds, on information and belief, was a motive to deny Seals's claim, along with the delay in payment or denial of claims of other Hartford policyholders and claimants.

121. In light of its financial conflict, Hartford should be given little or no discretion in its claims decision.

122.     Alternatively, the standard of review of this claim should be *de novo,* affording Hartford no discretion in its interpretation of the terms of the Policy and Plan or in its factual determinations. Both factual conclusions and legal determinations are reviewed *de novo* by the Court. *Ariana v. Humana Health Plan of Texas, Inc*., 884 F.3d 246 (5th Cir. 2018).

123. The Plan or Policy was delivered in Texas and is subject to the laws of that jurisdiction. Accordingly, Texas law applies under the ERISA savings clause. Texas has banned the use of discretionary clauses in insurance policies issued in this state. Tex. Ins. Code §1701.062; 28 Tex. ADMIN. CODE §3.1202. Accordingly, review of Seals's claim and Hartford's claims handling conduct, both in its interpretation of terms of the Policy and the Plan, and in its determination of the facts, should be *de novo.*

124.     In addition, Hartford's deemed denial, and its failure to provide a full and fair review are additional independent reasons for *de novo* review of this claim.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Seals respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant her the following relief:

a.     Award Plaintiff past benefits due and payable under the terms of the employee welfare benefit plan/insurance policy(ies) and/or pension plan pursuant to 29 U.S.C. §1132(a)(1);

b.     Enter a declaratory judgment as to Plaintiff's entitlement to future benefits and an appropriate order directing the Defendants to pay all similar claims of Plaintiff in the future pursuant to 29 U.S.C. §1132(a)(1);

c.  If Defendants voluntarily pay all past due benefits, enter a declaratory judgment as to Plaintiff's entitlement to future benefits, along with entering an appropriate order directing Defendants to pay similar claims to Plaintiff in the future, or in the alternative, for the Court to remove Defendants from their fiduciary roles in the administration of the Plan, and to appoint a special master to substitute for this Defendant with the special master having the authority to make all determinations as to Plaintiff's entitlement to future benefits;

d.  For a judgment against the Defendants awarding Plaintiff prejudgment interest, costs and expenses, and reasonable attorneys' fee under 29 U.S.C. §1132(g)(1);

e.  For a judgment making Plaintiff whole with respect to all costs related to Defendant Hartford's breach of the Parties' Joint Stipulation.

f.  For an order enjoining Defendants from further breaches of fiduciary or co-fiduciary duties, and direct that Defendants exercise reasonable care, skill, prudence, and diligence in the administration of Plaintiff's claim;

g.  For an order finding Defendants jointly and severally liable for the breaches described herein;

h.  For an order requiring Defendants to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under the Plan(s) and/or "programs" and specifically that the Plaintiff is entitled to waiver of premium benefits and continued coverage for all benefits she is entitled to under the terms of the Plan if disability benefits are awarded; and

i.  Such other relief as may be deemed just and proper.

Respectfully submitted,

/s/_____

Thomas O. Sinclair
Lee P. Fernon, Jr., TBA # 24094651
Sinclair Law Firm, LLC
2000 SouthBridge Parkway
Suite 601
Birmingham, AL 35209
T:  205.868.0818
F:  205.868.0894
E:  tsinclair@sinclairlawfirm.com
     lfernon@sinclairlawfirm.com


/s/_____

Amar Raval, TBA #24046682
S.D. No. 619209
Berg Plummer Johnson & Raval LLP
3700 Buffalo Speedway, Suite 1150
Houston, TX 77098
(713) 526-0200
(832) 615-2665 (Fax)
araval@bergplummer.com

**ATTORNEYS FOR PLAINTIFF**